IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

DEBRA SAGE PLAINTIFF

V. CIVIL ACTION NO. 3:24-CV-392-SA-RP

MORTGAGETRADE HOLDING CO., LLC DEFENDANT

ORDER AND MEMORANDUM OPINION

On December 27, 2024, Debra Sage initiated this litigation by filing her Complaint [1] against MortgageTrade Holding Co. ("MTrade"). In her Amended Complaint [5], which is the operative complaint, Sage asserts three separate claims under Title VII. MTrade has filed a Motion for Summary Judgment [60], seeking summary judgment in its favor on all three claims. That Motion [60] is fully briefed and ripe for review. Additionally, the parties have filed a litany of other Motions [62, 68, 72, 75, 84, 86] that the Court will address.

*Relevant Background*

This lawsuit concerns Sage's employment with MTrade. Sage contends that MTrade's decision to transfer her from her position as the Director of Product Development to the Director of Learning and Development position in February 2024 was retaliatory and discriminatory.

By way of background, MTrade is a financial technology company that operates a trading platform for debt instruments. MTrade was founded by Bill Rayburn and Lois Lovelady in 2016. Rayburn and Lovelady previously worked with Sage at a related company, and they recruited her to join MTrade. Sage agreed and was initially hired by MTrade as a Product Manager in January 2018.

Sage was later promoted to Senior Product Manager and held that position around two years before again being promoted to the position of Director of Product Development.[1] As the Director of Product Development, a position that was created for her, Sage's responsibilities included overseeing new product development and supervising nine or ten business analysts within the company. In the normal course of operations in this position, Sage frequently met with Brian Mullins, an employee in the development department. She also was involved in meetings with Duncan Chen, who is MTrade's Chief Technology Officer ("CTO") and Mullins' supervisor. She earned an annual salary of $180,000.

In the Director of Product Development position, Sage reported directly to the Chief Operating Officer ("COO"). When Sage first transitioned into this position, Vince Credle was the COO. Thus, she reported to him.

In October 2023, Sage notified Credle that she was pregnant with her third child. She testified that she had not yet publicly announced her pregnancy but that she made Credle, as her direct supervisor, aware because she was experiencing sickness and wanted to keep him apprised of her situation.

In his deposition, Credle testified that Sage reported to him complaints about Duncan Chen and his treatment of her. Although the question was not asked directly, the context surrounding this portion of the deposition testimony indicates that Credle estimates the complaint occurred in November or December 2023. As to the substance of Sage's complaint, Credle testified:

> Q. Do you remember specifically what Ms. Sage complained to you about regarding Mr. Chen?

---

[1] In her deposition, Sage testified that she was promoted to this position around August or September of 2023. *See* [60], Ex. 2 at p. 102-03. The unsworn "Job History" document that MTrade attached to its Motion [60] indicates that she obtained that position on April 1, 2023. *See* [60], Ex. 1. Although it is not critical to the disposition of the issues before the Court at this time, the Court notes that discrepancy for sake of completeness.

> A. Well, . . . he would not have meetings with her. And obviously, in her position, she was responsible for the quality control for the software his team was developing. He would schedule meetings without her, ignoring her, and he would also, uh, cancel meetings where -- if she was involved and just not meet with her and not talk to her directly. So it was a lot of -- you know, at first I thought it was okay, maybe this is just a communication thing, whatever. But there was a -- there was a consistent pattern of that, uh, for a period of time. Uh, I obviously talked to Duncan about it, and I thought we had -- had reso -- resolved it. So -- but, again, I don't know what happened after I left.

[69], Ex. 2 at p. 20.

During this time period, a particular project for which Sage was responsible was the Uniform Loan Delivery Dataset Project ("ULDD Project"), which was to be completed for Radian Capital Markets (one of MTrade's clients). In its Memorandum [61], MTrade described the ULDD Project and Sage's responsibilities related thereto as follows:

> The Uniform Loan Delivery Dataset is a standardized set of 383 required data fields. Loan information is drawn from multiple documents and loan types, all of which must align with those required fields for the loan to be processed successfully. Sage was responsible for managing project tickets—a prerequisite to any coding work by developers—and ensuring the necessary data mapping was completed for the project to function properly.

[61] at p. 4 (citations omitted).

Sage's performance in connection with the ULDD Project is a main point of contention in this litigation. On that point, Rayburn, who again is a co-founder of MTrade and serves as Chairman of the Board and CEO, testified that he received a call from Preston James, the COO of Radian, during which call James expressed to Rayburn his dissatisfaction with MTrade's performance in connection with the ULDD Project. Rayburn testified that he immediately called Sage about the project and that she told him "it will be done December the 11th." [60], Ex. 5 at p. 12. Rayburn testified about this conversation and the events that transpired thereafter:

Q. Okay. Did she tell you anything about why it wasn't ready at that moment of the call?

A. No. She said it's gonna be done December the 11th.

Q. Okay. Did she tell you anything of what she was going to do to make sure it was done by December 11th?

A. No.

Q. Okay. So December 11th arrives, and it's not ready. Right?

A. Yes.

Q. Okay. How did you find out it wasn't ready on December 11th? Maybe that's a better question.

A. I didn't on December 11th. I just assumed everything was fine.

Q. Okay. How did you find out that the deadline was missed?

A. So I asked, I don't know, a week or two later if we pushed that -- push is where you move from a testing server to a production server. When it goes to production, a client can use it. They can see it. And I said, "Are they taken care of? Are they good?" And she said "No, we still have some issues." Okay? And I said, "What are the issues?"

Q. Okay. Do you remember when this was?

A. Not the exact date but sometime, if I had to either -- late December or early January.

*Id*. at p. 14-15.

Sage testified that sometime around this time period Rayburn and Lovelady became aware of her pregnancy and "weren't very happy when they found out [she] was pregnant with [her] third [child]." [60], Ex. 2 at p. 223. When questioned about the basis for her belief on that point, she testified:

> We were at a Christmas party at the bowling alley when I told [Rayburn and Lovelady] I was pregnant. And they're like, "Oh, we heard. That's a third. That's a lot." And just kind of walked off.

*Id*.

In January 2024, Credle left MTrade. At that point, Sage began reporting directly to Lovelady. Sage alleges that in mid-January 2024, during a one-on-one meeting with Lovelady, she "expressed [] concerns about Duncan [Chen]." [60], Ex. 2 at p. 204. Specifically, she reported to Lovelady that Chen had called a former female employee a "stupid girl." *Id*. at p. 205. For context, that other employee was Lauren Van Helden and the "stupid girl" comment was made in 2022. Additionally, Sage reported to Lovelady that Chen had personally treated her inappropriately. *Id*. at p. 205. Further describing what she reported in that meeting, Sage testified:

> I told her about how [Chen] treated me in meetings, like I told you, like, where he would berate me. That he would cancel my meeting, and then I'd have somebody else schedule it, and he would show up. I told her about when there was a meeting that Vince had scheduled between Duncan and myself, Duncan told Vince that he refused to be in a meeting with "that girl," that he would meet with Vince and Vince only.

*Id*. at p. 207.

According to Sage, Lovelady seemed surprised and was apologetic.

Around a month later, on February 16, 2024, Lovelady met with Sage and advised her that the Director of Product Development position was being eliminated. Lovelady offered Sage the Director of Learning and Development position and provided her the job description for that position. The annual salary for that position was $155,000, thereby constituting a $25,000 pay reduction. According to Sage, Lovelady told her that this new position would "be more conducive to [her] lifestyle." *Id*. at p. 222. Sage ultimately accepted the position a few days later but testified

that she expressed to Lovelady her dissatisfaction with the company's decision. Sage remains employed with MTrade in the Director of Learning and Development role.

Sage initiated this lawsuit on December 27, 2024. In her Amended Complaint [5], she asserts three separate Title VII claims—(1) retaliation; (2) pregnancy discrimination; and (3) sex discrimination. MTrade seeks summary judgment in its favor on all three claims.

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Management of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalist

arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

Prior to addressing the substantive arguments in MTrade's Motion for Summary Judgment [60], the Court will address the myriad of other Motions [62, 68, 72, 75, 84, 86] the parties filed, spanning a variety of topics.

*I. Preliminary Matters*

As to the issues to be addressed at the outset, the Court first looks to Sage's Motion for Sanctions [62]. In that Motion [62], Sage seeks sanctions, pursuant to Federal Rule of Evidence 37(e), based upon MTrade's alleged failure to engage in adequate efforts to preserve evidence related to her claims after receiving a litigation hold letter.

The crux of Sage's Motion [62] is that on March 22, 2024, she, through her prior counsel, sent MTrade a formal litigation hold letter putting the company "on notice to maintain the integrity of all evidence, documents, reports, communications, emails, texts, and any other records related to Ms. Sage's employment." [62], Ex. 1 at p. 1. Additionally, by May 21, 2024, MTrade had received notice from the EEOC regarding Sage's charge which, according to Sage, "creat[ed] an independent regulatory preservation obligation under 29 C.F.R. § 1602.14 to maintain all personnel records relevant to the charge, including those of employees in similar positions." [63] at p. 2. However, on the date MTrade received the formal litigation hold letter, it placed a hold *only* on Sage's email account. *Id*. Importantly, "[o]ther relevant custodians, including key decision-makers . . . were not placed on hold until approximately March 20, 2025—nearly one year later." *Id*. And a hold was *never* placed on Rayburn's account.

Sage then alleges the specific evidence that she contends was lost due to MTrade's inadequate preservation efforts:

> (1) Email communications between Bill Rayburn and Lois Lovelady that contradicted their deposition testimony denying electronic communications about Plaintiff's case;
>
> (2) The Culpepper salary survey report, which MortgageTrade admitted was not retained despite it centrality to the justification for Plaintiff's demotion and pay reduction;
>
> (3) Calendar invitations and meeting responses that could demonstrate Plaintiff's systematic exclusion from important business meetings;
>
> (4) Microsoft Teams communications regarding the transition of Plaintiff's duties to male colleagues, which were lost due to the short retention policy.

*Id*. at p. 3.

After pointing out these shortcomings, Sage contends that MTrade's conduct evinces a willful disregard of the applicable Rules governing preservation of evidence, and she therefore seeks adverse inference jury instruction(s), as well as an application of "evidentiary presumptions that the destroyed evidence would have supported [her] claims of discrimination." [63] at p. 15.

MTrade makes multiple arguments in response, ranging from Sage's contentions being speculative insofar as they assert what materials may have existed, to the materials being privileged, to Sage being unable to show an intent to deprive, as well as an assertion that Sage's request is procedurally defective.

Rule 37(e) provides courts authority to impose sanctions "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery[.]" FED. R. CIV. P. 37(e). The Rule contemplates different sanctions

depending upon whether there is a finding that the party acted with "intent to deprive another party of the information's use in the litigation[.]" *Id*. at R. 37(e)(2).

The Court is cognizant of the parties' respective positions and does not take lightly allegations pertaining to the failure to preserve evidence as required under the governing standards. However, for purposes of the Motion for Summary Judgment [60], the Court need not delve further into or make definitive rulings on these arguments, as the disposition of the request for summary judgment, which the Court will address hereinafter, would be unaffected.

The Motion for Sanctions [62] is therefore DENIED. In light of this ruling, MTrade's Motion to Amend [68] is DENIED AS MOOT.

The Court next turns to Sage's Motion to Strike [72], wherein she seeks to strike the sworn declaration of Brian Mullins (an employee in MTrade's development department), which was attached to MTrade's Motion for Summary Judgment [60]. *See* [60], Ex. 7. According to Sage, Mullins' declaration, which concerns his opinions on Sage's performance in the Director of Product Development role, is irrelevant since MTrade's "own discovery responses identified complaints from Radian as the cause of Plaintiff's demotion, not any performance evaluations or opinions form Mr. Mullins." [73] at p. 3.

While aware of Sage's contention as to the relevance (or lack thereof) of Mullins' declaration, the Court will not altogether strike it. Instead, the Court will permit it to remain part of the record and afford it the weight it deems appropriate when resolving the Motion for Summary Judgment [60]. The Motion to Strike [72] is DENIED.

On February 9, 2026, MTrade filed a Motion to Strike [75] Sage's Response [69] and Memorandum [70] opposing the Motion for Summary Judgment [60]. MTrade points out that, while the Court extended Sage's deadline to respond to the Motion for Summary Judgment [60]

until January 27, 2026, Sage did not actually file the Response [69] and Memorandum [70] until February 2, 2026. MTrade seeks to strike Sage's Reply [71] in connection with her Motion for Sanctions [62] for the same reason.

While the Court expects litigants to comply with the applicable deadlines, considering the circumstances of this case and the explanation Sage provided in her responsive filing, the Court finds it inappropriate to strike a response to a dispositive motion of this nature. The Motion to Strike [75] is DENIED. Additionally, the Court DENIES AS MOOT Sage's subsequently filed Motion for Extension of Time [84]. The Court will consider the substance of Sage's Response [69] and Memorandum [70] in ruling on the Motion for Summary Judgment [60].

As a final preliminary issue, the Court turns to Sage's Motion to Amend [86], wherein she seeks to amend her affidavit that was attached to her Response to Motion for Summary Judgment [69]. Specifically, she states that the "affidavit had a typographical error that referenced on paragraph 11 that Plaintiff had a meeting with Steve Perry on February 16, 2023; however, that should be February 16, 2024. . . Plaintiff seeks to substitute her affidavit to correct this typographical error." [86] at p. 1. MTrade opposes Sage's request, arguing that the "proposed amendment does far more than correct a date. Instead, it attempts to introduce a new factual theory supporting her retaliation claim—one that Plaintiff never pled and expressly disclaimed in her sworn deposition testimony." [92] at p. 1.

The Motion to Amend [86] is GRANTED. The Court will permit the amendment so that the correct date is listed on the affidavit. In reaching this ruling, the Court is cognizant of MTrade's position that Sage should not be permitted to expand the theory of her case via an affidavit. Providing an accurate date does no such thing. In resolving the Motion for Summary Judgment [60], the Court will remain cognizant of MTrade's argument that the scope of Sage's pleadings

should not be extended. But granting the present request does not undermine that argument. Consistent with this ruling, the Clerk of Court will replace the exhibit on the docket.

*II. Merits*

Having resolved those issues and clarified the evidence it will consider, the Court turns to the merits of MTrade's Motion for Summary Judgment [60]. As noted previously, Sage's Amended Complaint [5] asserts three Title VII claims: Count 1 - retaliation; Count 2 - pregnancy discrimination; and Count 3 - sex discrimination. MTrade seeks summary judgment on all three claims.

*A. Retaliation Claim*

"The antiretaliation provision of Title VII prohibits an employer from 'discriminating against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VIII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 576-77 (5th Cir. 2020) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006); 42 U.S.C. § 2000e-3(a)) (additional quotation marks omitted).

In a circumstantial evidence case, "the plaintiff has the burden to prove a prima facie case of retaliation by showing (1) she engaged in a protected activity; (2) she 'suffered an adverse employment action'; and (3) 'a causal connection exists between the protected activity and the adverse employment action.'" *Id*. at 577 (quoting *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000)). If the plaintiff meets this burden, "then the employer has the burden of production to provide a legitimate, non-discriminatory reason for the adverse employment action." *Id*. (quoting *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004)) (quotation marks omitted). Once

the employer meets this burden, the burden shifts back to the plaintiff "to prove that the proffered reason is pretextual." *Id*. (citing *Patrick*, 394 F.3d at 315).

*i. Prima Facie Case*

MTrade contends that Sage has not come forward with sufficient evidence to support the first or third prima facie elements.

As to the first element, a plaintiff "need only show that [she] had a 'reasonable belief that the employer was engaged in unlawful employment practices.'" *Bruno v. RIH Acq. MS I, LLC*, 530 F. Supp. 2d 819, 821 (N.D. Miss. 2008) (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 349 (5th Cir. 2007)); *see also Jones v. Miss. Valley St. Univ.*, 2021 WL 5629227, at *3 (N.D. Miss. Nov. 30, 2021) (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996)) ("To show that the activity was protected, the employee must have had 'at least a reasonable belief that the practices [she] opposed were unlawful.'"). As phrased by the Fifth Circuit, "the reasonable belief standard recognizes there is some zone of conduct that falls short of an actual violation but could be reasonably perceived to violate Title VII." *EEOC v. Rite Way Serv., Inc.*, 819 F.3d 235, 242 (5th Cir. 2016).

MTrade contends that Sage cannot meet this burden because she could not have reasonably believed that Chen's conduct about which she complained constituted an unlawful employment practice.

The Court thus turns to the substance of Sage's complaint to Lovelady. In her deposition, Sage testified that during a mid-January 2024 meeting with Lovelady (who was her direct report at the time), she told Lovelady "about Duncan calling Lauren 'a stupid girl,' which is why she left mTrade." [60], Ex. 2 at p. 205. Sage further testified about what she told Lovelady regarding his treatment of her in their interactions:

> I told her about how [Chen] treated me in meetings, like I told you, like, where he would berate me. That he would cancel my meeting, and then I'd have somebody else schedule it, and he would show up. I told her about when there was a meeting that Vince had scheduled between Duncan and myself, Duncan told Vince that he refused to be in a meeting with "that girl," that he would meet with Vince and Vince only.

*Id*. at p. 207.

Sage went on to state she "just wanted [Lovelady] to be aware because they were trying -- obviously, they were trying to diversify and hire more qualified females, women of color, all those things, and so I thought it was very important for her to know what was going on." *Id*. at p. 205.

MTrade raises multiple arguments as to why Sage's conduct did not constitute a protected activity. None are persuasive. For instance, MTrade first contends that Sage identified "only a single instance of a mere offensive utterance." [61] at p. 9. This argument views the evidence too narrowly. In addition to testifying that she told Lovelady about Chen allegedly referring to a former female employee as a "stupid girl," Sage testified that she also told Lovelady that Chen personally treated her inappropriately by cancelling and/or failing to attend meetings she scheduled because he refused to be in a meeting with "that girl." [60], Ex. 2 at p. 205. Thus, MTrade's characterization of the conduct at issue being nothing more than a mere offensive utterance is simply an inaccurate representation of Sage's position.

MTrade additionally emphasizes the high standard of proof applicable for a plaintiff to prevail on a hostile work environment claim under Title VII and contends that no reasonable person could believe that Chen's conduct constituted an unlawful employment practice. *See*, *e.g.*, *Goree v. City of Verona*, 2021 WL 4449985, at *4 (N.D. Miss. Sept. 28, 2021) (noting that a viable hostile work environment claim exists where the subject conduct is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

environment[.]") (citations omitted). While the standard for a hostile work environment claim is indeed a high threshold, to meet the first prima facie element on a retaliation claim, Sage must only show that she had a "reasonable belief" that she opposed an unlawful employment practice. *Bruno*, 530 F. Supp. 2d at 821. The Fifth Circuit has framed the inquiry this way: "Could an employee like [the plaintiff], not instructed on Title VII law as a jury would be, reasonably believe that she was providing information about a Title VII violation?" *Rite Way*, 819 F.3d at 242 (citation omitted). Expounding on this point, in *Rite Way*, the Fifth Circuit provided an extensive explanation of its 1996 decision in *Long v. Eastfield College*:

> But opposition clause claims grounded in isolated comments are not always doomed to summary judgment. In *Long v. Eastfield College*, a female plaintiff complained internally after a supervisor made an offensive joke about condoms in her presence. 88 F.3d 300, 309 (5th Cir. 1996). She alleged that this initial grievance caused the supervisor to treat her differently than other employees—prompting her to lodge two other internal complaints—and eventually led to her termination. *Id*. at 305. We affirmed summary judgment on her sexual discrimination claim because "the alleged joke in this case is exactly the type of mere offensive utterance which should not, by itself, support a claim for hostile work environment." *Id*. at 309. But we reversed summary judgment on her retaliation claim. *Id*. Viewing the joke and the supervisor's alleged reactions to her internal complaints together, we found that the plaintiff had "sufficient evidence to create a fact issue as to her "reasonable belief" that the supervisor's conduct violated Title VII." *Id*. at 305.

*Id*. at 243.

Although there are undoubtedly differences between the conduct at issue in *Long* and at issue in this case, the Fifth Circuit's explanation is instructive.

Here, Sage allegedly told her supervisor that Chen had called another female employee a "stupid girl," which prompted that employee to leave the company. [60], Ex. 2 at p. 205. She went on to report that Chen refused to participate in meetings with her and would sometimes simply not

show up for meetings that she planned. What's more, she reported that Chen had told Credle, the COO at the time, that he refused to meet with "that girl." *Id*.[2]

While, as MTrade points out, Chen was not her direct supervisor, he held a critical role at the company as the Chief Technology Officer of the company. And, in her deposition, Sage explained the necessity of close working relationship between her and Chen to accomplish the required tasks: "When I got into director of product and I'm having to respond and speak for all of these projects, I'm having to set the dates, I'm having to manage it with clients and with the executive team, I need you to talk to me, I need you to tell me what your team is capable of, and you won't do it." [60], Ex. 2 at p. 251.

Taking all of this into account, there is at a minimum a question of fact as to whether Sage reasonably believed that she was reporting an unlawful employment practice when she reported Chen's conduct to Lovelady. That is sufficient for purposes of this stage of the proceedings. *See Bruno*, 530 F. Supp. 2d at 821

MTrade does not contest the second element—Sage was subjected to an adverse employment action when she was transferred to the Director of Learning and Development position and suffered a pay reduction of $25,000 in February 2024.

The third element requires that the plaintiff establish a causal connection between the protected activity and the adverse employment action. *Snyder v. L-3 Comms. Vertex Aerospace,*

[2] The Court recognizes MTrade's contention that Chen's alleged statement to Van Helden is hearsay and should not be considered. But at the summary judgment stage, "materials cited to support or dispute a fact need only be *capable* of being presented in a form that would be admissible in evidence." *Balboa Capital Corp. v. Okoji Home Visits MHT, LLC*, 111 F.4th 536, 546 (5th Cir. 2024) (quoting *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017)) (emphasis in original). Furthermore, the Court notes, without making any definitive finding on the point, that there may be exclusions or exceptions to the applicable Rules of Evidence pursuant to which this statement could be admitted at trial. Nonetheless, for purposes of the present stage of the proceedings, the Court rejects MTrade's request to altogether exclude the evidence based on a hearsay objection.

*LLC*, 2020 WL 869977, at *10 (N.D. Miss. Feb. 21, 2020) (citation omitted); *see also Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008). While the but-for causation standard is ultimately applicable to Title VII retaliation claims, that "the but-for standard does not apply at the prima facie case stage." *Brown*, 969 F.3d at 577 (citing *Garcia v. Prof'l Cont. Servs., Inc.*, 938 F.3d 236, 242 (5th Cir. 2019)). Rather, at this stage, "a plaintiff can meet his burden of causation simply by showing close enough timing between his protected activity and his adverse employment action." *Id*. (quoting *Garcia*, 938 F.3d at 243); *see also Chang v. Miss. State Univ.*, 2026 WL 1103446, at *8 (N.D. Miss. Apr. 23, 2026) (noting that "a plaintiff may meet their burden of causation at the prima facie stage by simply showing temporal proximity between protected activity and the adverse employment action[.]").

Here, the approximate one-month time lapse between Sage's protected activity and the transfer to the Director of Learning and Development position is sufficiently close to establish a prima facie case. *See*, *e.g.*, *Garcia*, 938 F.3d at 243 (citing *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994-95 (5th Cir. 2005)) ("This court has previously held that a period of two months is close enough to show a causal connection.").

For purposes of the summary judgment stage, Sage has provided sufficient evidence to establish a prima facie case.

*ii. Legitimate, Non-discriminatory Reason*

The burden then shifts to MTrade to provide a legitimate, non-discriminatory reason for the adverse employment decision. *Brown*, 969 F.3d at 577. MTrade takes the position that Sage was transferred because of poor performance. This is sufficient for purposes of the present stage of the proceedings.

*iii. Pretext*

The burden then shifts back to Sage to show that MTrade's proffered reason "is a pretext for the actual retaliatory reason." *Aryain*, 534 F.3d at 484 (citation omitted). "A plaintiff may establish pretext by showing that a discriminatory motive more likely motivated her employer's decision, such as through evidence of disparate treatment, or that her employer's explanation is unworthy of credence." *Brown*, 969 F.3d at 577 (quoting *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 363 (5th Cir. 2013)). The Fifth Circuit has noted that, at the pretext stage, "we consider 'numerous factors, including the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered.'" *Shahrashoob v. Texas A&M Univ.*, 125 F.4th 641, 653 (5th Cir. 2025) (quoting *Saketkoo v. Administrators of Tulane Educ. Fund*, 31 F.4th 990, 1002 (5th Cir. 2022)) (additional citation omitted).

Concerning causation, MTrade argues that Rayburn, who (along with Lovelady) was responsible for the decision to transfer Sage, lacked knowledge of Sage's complaints about Chen. MTrade contends that this "defeat[s] any inference of retaliatory causation." [61] at p. 12. It goes on to point to Lovelady's testimony wherein she testified that Rayburn wanted to terminate Sage but that she wanted to transfer her, which is ultimately what occurred.

The Court rejects this argument. At the outset, the Court notes that Rayburn and Lovelady are married and each of them testified that they jointly make decisions on behalf of the company. Each of them testified that many of their communications about company operations are not in writing but that they frequently have verbal discussions about the company. It is, in this Court's view, quite plausible that Rayburn, who is married to and jointly made the employment decision at issue with Lovelady, was made aware of Sage's complaint. The Court realizes that such a

conclusion is speculative; but, even assuming that Rayburn was completely unaware of the complaint, Lovelady, one of only two of the people involved in the decision, was certainly aware of it. The Court declines to view this evidence so narrowly as MTrade suggests.[3]

Sage also points to evidence indicating that MTrade's articulated reason for its decision to transfer her—poor performance—is unworthy of credence. First, Sage testified that performance reviews are supposed to be conducted yearly "but sometimes it did not happen." [60], Ex. 2 at p. 93. This is consistent with the lack of performance reviews in the record in this case. However, Sage testified that Credle provided her a positive performance review in 2023. The 2023 performance review itself was not made part of the record, but Credle essentially confirmed her testimony on this point in his deposition testimony when asked about Sage's performance under his supervision. In particular, he testified that her "performance was outstanding." [69], Ex. 2 at p. 13. Additionally, Ashby Kendall Raine, who testified as MTrade's Rule 30(b)(6) deponent, testified that he was unaware of Sage ever receiving a written reprimand regarding her performance. *See* [60], Ex. 6 at p. 41.

Notably, in addition to characterizing Sage's performance as "outstanding," Credle's testimony went further. [69], Ex. 2 at p. 13. When questioned about whether Rayburn himself ever expressed to him any concerns about Sage's performance, Credle responded, "[n]o, actually, quite the opposite. . . He said . . . she was one of the most, uh, brilliant, uh, people he had -- he had met and, uh, you know, praised her a lot and thought very highly of her." *Id*. at p. 29.[4]

---

[3] Notably, this is where Sage's request for sanctions comes into play, as she contends that MTrade failed to take steps to preserve communications between Rayburn and Lovelady on this topic. The Court finds that it need not implement sanctions to reach its conclusion on this point, as MTrade's argument is a non-starter regardless.

[4] Credle's testimony as to Rayburn's opinion on Sage's performance is notable considering that Lovelady testified that she and Rayburn "had been speaking for a long time about [transferring Sage]." [60], Ex. 13 at p. 19.

Specifically concerning Radian and the ULDD Project, Rayburn testified as follows:

> Q. I think we've already talked about this a little bit. I think you talked to Debra about the missed deadline, and she told you it was a mapping issue?
>
> A. Well, she did say it was a mapping issue. And she also said -- she led me to believe, anyway, that Radian was happy. They were working through it and they were happy.
>
> Q. Okay. And you were getting communications from Radian of the opposite?
>
> A. They were not happy. They were not happy at all. I just did not know how unhappy they were.
>
> . . .
>
> Q. Okay. And that concerned you that they might be looking at [cancelling the contract with MTrade]?
>
> A. Absolutely. And then at a meeting in Las Vegas at the end of February, they unloaded on me. Jim Svinth, who is the CEO of Radian Capital Markets, and Preston James, who was the COO of Radian Capital Markets, I mean, they unloaded on me.

[60], Ex. 5 at p. 19-20.

The timeline is important. Sage was transferred on February 16, 2024. Thus, any information that Rayburn learned at the Las Vegas meeting at the end of February 2024 could not have played a role in the decision he and Lovelady had already made. While he testified that he was aware Radian was not happy prior to the transfer decision, MTrade has pointed to little in the form of evidence to substantiate that assertion. Furthermore, while Rayburn testified that he discovered what the ultimate issue was as far as MTrade's failure to perform on the ULDD Project, he estimated that he did not ultimately find out the cause until "somewhere in the March to April timeframe." *Id*. at p. 15-16.

While there is certainly some evidence in the record to support MTrade's argument that Sage's performance in connection with the ULDD Project was inadequate, the timeline is far from clear. And Sage herself has pointed to evidence that, taken as true, casts substantial doubt on MTrade's position.

The reality is that Sage complained to Lovelady about Chen's treatment of her and, approximately one month later, was transferred to another position with a lower salary. Lovelady and her husband were the only two decisionmakers involved in the transfer decision. And while MTrade has pointed to Sage's performance as the basis for the decision, Sage has come forward with substantial evidence indicating that explanation is unworthy of credence.

Taking all of this into account, summary judgment is not warranted because, viewing the evidence in the light most favorable to Sage, a reasonable jury could conclude that MTrade's proffered reason for the transfer—poor performance—is pretextual. *See Garcia*, 938 F.3d at 244 ("The combination of suspicious timing with other significant evidence of pretext can be sufficient to survive summary judgment.") (citation omitted).

Sage will be permitted to proceed to trial on her retaliation claim.

*III. Discrimination Claims*

Sage additionally brings Title VII claims for pregnancy discrimination (Count 2) and sex discrimination (Count 3).

Title VII of the Civil Rights Act of 1964 makes it illegal for a covered employer "to discriminate against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act ("the PDA"), which was enacted in 1978, added two clauses to Title VII. As pertinent here, the PDA specified that "the terms 'because of sex' or 'on the basis of sex' [in Title

VII] included, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions." *Townsend v. Town of Brusly*, 421 F. Supp. 3d 352, 358 (M.D. La. 2019) (quoting 42 U.S.C. § 2000e(k)(2)).

A claim for pregnancy discrimination is analyzed in the same way as any other type of Title VII discrimination claim." *McLaughlin v. W & T Offshore, Inc.*, 78 F. App'x 334, 337 (5th Cir. 2003) (citing *Urbano v. Cont'l Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998)).

Absent the existence of direct evidence, the *McDonnell Douglas* burden-shifting framework is applicable. *See Shell v. Bauhaus Furniture Grp.*, LLC, 2026 WL 1270812, at *2 (N.D. Miss. May 8, 2026). Therefore, like the retaliation claim analyzed previously, the burden is first on Sage to establish a prima facie case, then shifts to MTrade to produce a legitimate, non-discriminatory reason for its decision, and then reverts to Sage to show pretext. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)) (additional citations omitted).[5]

Beginning with the prima facie case, Sage must show that she was (1) a member of a protected class; (2) qualified for her position; (3) subjected to an adverse employment action; and (4) replaced by someone outside the protected class or treated less favorably than employees outside the protected class. *Id.* (citing *McDonnell Douglas Corp.*, 411 U.S. at 802) (additional citations omitted).

For purposes of summary judgment, MTrade concedes the first three elements; however, it contends that Sage cannot establish the fourth prima facie element because she was not replaced

[5] The Court does not intend to imply that there are not differences in the appropriate analysis of a retaliation claim as compared to a discrimination claim—obviously, differences exist. However, the burden-shifting framework itself applies to both.

and has identified no valid comparator. For her part, Sage contends that, while her exact position with the same job title may not have been filled, Adam Grace, a male, effectively replaced her.

As to the lack of replacement, MTrade specifically asserts that "[t]he Director of Product Development position was eliminated, and its duties were temporarily redistributed among multiple existing employees." [61] at p. 14. MTrade further asserts that "[e]ven if Grace were considered a permanent replacement—which he was not—the roles are materially different" and points out that Grace reports to a different executive than Sage did and "ha[s] different management responsibilities." *Id*.

While true that MTrade did not fill Sage's previous position, MTrade's argument is largely undercut by Rayburn's deposition testimony. When questioned about the responsibilities associated with Sage's previous position, he testified as follows:

> Q. The duties that Ms. Sage had as Director of Product Development, do you know who is performing those duties now?
>
> A. Well, I do. Yes.
>
> Q. Okay. Who is that?
>
> A. So that is being performed by a gentleman by the name of Adam Grace.
>
> Q. Okay. And what is his job title?
>
> . . .
>
> A. So his job title, I think, is Manager of Product Development. I think that's right. But it may be Senior Product Manager. I don't remember the exact title.
>
> Q. Okay. Did he absorb Ms. Sage's duties on top of what he was already doing, or did he just essentially replace Ms. Sage?

A. No, he -- initially we divided the responsibilities when we moved her to the new position. We divided the responsibilities. And then sometime later he was hired and he grew into that role.

Q. Okay. But for his role what he grew into, is it essentially the same position, same duties, as what Ms. Sage was doing as Director of Product Development?

. . .

A. (Nods head up and down) For all practical purposes.

Q. All practical purposes, yes?

A. Responsibility, yes.

[60], Ex. 5 at p. 10-11.

When thereafter questioned by counsel for MTrade, Rayburn provided a further explanation:

Q. . . . Did that Director of Product Development position exist after she was moved out of it?

A. Well, it existed, but there was no one that filled it. You know, we -- when I say existed, we eliminated the actual role as in one person and spread[] it among many people for about six months. I'm doing this from memory.

Q. Yes, sir. Who were the people that it was spread among?

A. Well, Kim Byler took some of it. I took some of it. Brian Mullins took some of it, who is our head of development. There were others, but I know of those three.

*Id*. at p. 26-27.

Thus, the crux of Rayburn's testimony is seemingly that Sage's job duties were initially dispersed between multiple employees for a period of approximately six months but eventually absorbed by Grace.

Although the underlying facts differed to some extent, this Court has recently pointed out that "[t]he Fifth Circuit has previously held that a plaintiff met her prima facie burden when her position was eliminated and her job duties were redistributed among co-workers outside of her protected class." *Green v. Univ. of Miss.*, 2025 WL3539292, at *3 (N.D. Miss. Dec. 10, 2025) (citing *Young v. Harris Health Care, Inc.*, 226 F.3d 643, 2000 WL 1029180, at *1 (5th Cir. 2000)). Importantly, in *Green*, this Court also emphasized that "[t]he Fifth Circuit has noted that the prima facie case method established in *McDonnell Douglas* was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Id.* (quoting *Johnson v. La.*, 351 F.3d 616, 622 (5th Cir. 2003)) (additional citations omitted; quotation marks omitted).

MTrade's argument runs contrary to this guidance. There is evidence in the record, in the form of sworn testimony from MTrade's own CEO, to indicate that around six months after Sage was transferred, her job responsibilities were absorbed by a single male employee. Considering that fact and the overarching flexible standard, Sage has come forward with sufficient evidence to preclude summary judgment as to whether she was replaced by someone outside of her protected class.

The burden then shifts to MTrade to provide a legitimate, non-discriminatory reason for the decision to transfer Sage. *See*, *e.g.*, *Burnett v. East Tallahatchie Sch. Dist.*, 2024 WL 130838, at *4 (N.D. Miss. Jan. 11, 2024). As noted previously, MTrade raises poor performance as the reason for its decision.

The burden then shifts back to Sage to show pretext. *See id*. In its Memorandum [61], MTrade's sole argument on pretext as to the discrimination claims is as follows:

> Even assuming arguendo that Sage has established a prima facie case, she cannot rebut MortgageTrade's legitimate, non-

> discriminatory reason for her demotion—performance deficiencies. Nor can she establish discriminatory animus where the record shows that she received two promotions, including one that occurred during one of her pregnancies; received paid maternity leave; and was celebrated with a company-hosted baby shower. Notably, MortgageTrade's Founders recruited Sage from their former company while she was pregnant.

[61] at p. 15.

Regarding Sage's performance, the Court relies on the evidence previously referenced in connection with her retaliation claim. As noted in that analysis, Sage has provided evidence to the contrary, including Credle's testimony regarding his opinion as to her performance as well as the information he relayed regarding Rayburn's opinion of her. Furthermore, she has pointed to the lack of documentation that her performance was poor.

Additionally, although not addressed in connection with the retaliation claim, the Court also notes that Sage alleges that, when notifying her of the transfer, Lovelady, who was one of the two decisionmakers and who was aware of her pregnancy, specifically told her that the new position would be "be more conducive to [her] lifestyle." [60], Ex. 2 at p. 222. This alleged statement, which Lovelady disputes but which the Court views in the light most favorable to Sage at this stage, is highly probative of pretext.

Although MTrade raises arguments in opposition to Sage's position, for purposes of summary judgment, she has provided sufficient evidence for her discrimination claims to survive. *See*, *e.g.*, *Grogan v. Kumar*, 873 F.3d 273, 279 (5th Cir. 2017) ("It is not the court's role on summary judgment to weigh competing evidence or make credibility determinations."). She will be permitted to proceed to trial on them.

*Conclusion*

MTrade's Motion for Summary Judgment [60] is DENIED. Sage will be permitted to proceed on all three claims.

Sage's Motion for Sanctions [62] is DENIED. The Court will take up the matter of whether sanctions shall be imposed prior to trial.

The other Motions are disposed of as follows: MTrade's Motion to Amend [68] is DENIED AS MOOT; Sage's Motion to Strike [72] is DENIED; MTrade's Motion to Strike [75] is DENIED; Sage's Motion for Extension of Time [84] is DENIED AS MOOT; and Sage's Motion to Amend [86] is GRANTED. As to the Motion to Amend [86], the Clerk of Court shall replace Exhibit 5 to Sage's Response [69] with the Exhibit attached to the Motion to Amend [86].

SO ORDERED, this the 1st day of September, 2026.

/s/ Sharion Aycock
SENIOR UNITED STATES DISTRICT JUDGE